KETCHUM v. MOBILE & OHIO R. CO. See Cases Nos. 4,137, 4,138, and 4,139.

---

## Case No. 7,' 3 ).

KETCHUM et al. v. PACIFIC R. CO. et al.

[4 Dill. 41, note;[1] 3 Cent. Law J. 725; 22 Int. Rev. Rec. 383.]

(Circuit Court, E. D. Missouri. Sept., 1876.)

· TAX BILLS—PRESUMPTION — CONSTITUTIONAL LAW —BOARD OF EQUALIZATION — POWER OF BOARD OF EQUALIZATION — CASE IN JUDGMENT — LAW GOVERNING — POWER OF COURT OVER WRONG ASSESSMENT—MISTAKE OF FACT—PENALTIES UNDER ACT OF MARCH 15, 1875—ATTORNEY'S FEES UNDER ACT OF MARCH 29, 1875.

1. In a suit to collect taxes, tax bills, purporting to be certified by duly authorized officers, are presumed to be correct, and the burden of proof as to their illegality lies upon those contesting them.

2. Under the new constitution of Missouri, the board of equalization created by section 18, art. 10, became at once the only board for those purposes, and was clothed with all the powers of the previous board.

3. The board of equalization, under the new constitution, has power to act as an original assessing body.

---

[1] [Reported by Hon. John F. Dillon, Circuit Judge, and here reprinted by permission.]

4. Section 11, of article 10, of the new constitution of Missouri, which took effect November 30, 1875, limits the rate of taxation for local purposes to an amount less than that allowed under the previous law. The levies in controversy were not ascertained until the summer of 1876, although the date at which the assessments were made relates back to the first of August, 1875. Held, that the rates prescribed by the new constitution must control.

5. Section 12 of the act of March 24, 1873, provides that, for the purpose of levying school taxes in counties on railroad property, the county courts shall ascertain from the returns in the office of the clerk of the county court, the average rate levied for school purposes by the school boards, and shall charge to the railroad companies taxes at said rates on the proportionate value of their property, certified to the clerk by the state auditor. Section 65 of the act of March 26, 1874, requires the district boards to ascertain and report to the county court the amount they will require for school purposes for the ensuing year, and thereupon the county clerk shall assess the amount so returned, on all taxable property in said districts, as shown by the last annual · assessment. The defendants offered to prove, by the records of the county courts, that the rate for school purposes had been ascertained by taking the amount required by each school board, and dividing it by the total property in the district, exclusive of railroad property, as shown by the last assessment, and that in extending this rate upon the taxable property, the valuation of the railroad property within the district was included. Held, inadmissible. A court cannot assume the functions of an assessor, and reduce the assessable value, nor include omitted property which is taxable. It must rely upon the assessment. If it exceeds the legal or constitutional limit, the court must cut it down. The functions of the court are not to value or assess, but simply to decide whether the rate is in excess, and at that point its functions cease.

6. In a suit for the recovery of taxes, the court cannot go behind the assessment and valuation made by the board of equalization as to the number of miles of a railroad in a specified county. It cannot equalize and adjust the amount of taxable property in a county, nor correct mistakes of fact made by the board of equalization.

7. Receivers appointed by the court being in possession of the defendant road, during vacation, the tax bills in question were presented to them for payment. Doubts existing as to the legality of some of the levies, an arrangement was entered into between the attorneys of the receivers and petitioners, that the advice of the court should be taken upon the question. Held, that the defendant company did not come within the terms of the act of March 15, 1875, which provides a penalty of two and one-half per centum where any railroad shall fail to pay taxes levied upon it, but that the court would award interest at the rate of ten per cent. per annum from the day the taxes became due, in lieu of a penalty.

8. Section 4 of the act of March 29, 1875, allows a sum equivalent to five per cent. of the sum recovered, to be sued for as attorneys' fees "whenever any railroad company shall fail or shall have heretofore failed, within the time prescribed by law, to pay any taxes assessed and levied against it, etc." Held, that the petitions in this suit were not suits for the recovery of taxes, within the meaning of said act. Held, further, that the amicable arrangement entered into between the parties to settle the amount of taxes due, by asking the advice of the court, did not come within the act.

In equity.

TREAT, District Judge. The defendant railroad being in the hands of receivers appointed by this court, a number of counties filed their intervening petitions, asking for the payment of taxes assessed against the companies while in possession of the receivers, and that the same should be paid out of the fund in their hands. The cases were referred to a master [S. D. Thompson, Esq.], who made the following report:

"Intervening petitions of Johnson, Gasconade and Osage counties.

"1. As to the burden of proof. The counsel for the respondents insists that the burden lies in the first instance upon the petitioners to show at every step the legality of the taxes which they here ask the court to order the receivers to pay. I do not think this position well taken. I think that here, as in every other case, the burden of proof is, in the first instance, upon the plaintiff; but, that when the plaintiff presents, certified by the proper officer, tax bills purporting to have been made by duly authorized officers, and in conformity with law, this makes a prima facie case of right, and, thereafter, the burden shifts and remains with the respondents throughout the case. It seems to me that the case resembles the case of an action on a foreign judgment. Where a duly certified transcript of the record of the judgment is presented, this makes out the plaintiff's case, unless it appears upon the face of the record that the proceedings were void. The position contended for would place the petitioners in the attitude of wrongdoers, who come into this court, hat in hand, apologizing for their acts in advance; whereas, it seems to me, they stand here as representatives of a sovereign state, demanding its revenue; and it remains for an objector to put the sovereign in the wrong. I therefore respectfully recommend on this point, that your honors direct that the tax bills presented in support of the intervening petitions, if duly certified in conformity with law, shall be deemed conclusive, except so far as the respondents show them to be illegal, and that they shall be then rejected only as to the illegal excess.

"2. As to the legality of the existing state board of equalization. The respondents contend that the state board of equalization which adjusted and equalized the valuation of railroad property in this state for the year 1875, viz., the board created by the new constitution (article 10, § 18), consisting of the governor, state auditor, state treasurer, secretary of state and attorney-general, was not the lawfully constituted board of equalization, but that the lawfully constituted board was the board created by the act of March 24, 1873, composed of the lieutenant governor and senate. The article of the new constitution in question simply says: 'There shall be a state board of equalization, consisting of the governor, state auditor, state treasurer, secretary of state and attorney-general. The duty of said board shall be to adjust and equalize the valuation of real and personal property among the several counties in the state, and it shall perform such other duties as are, or may be, prescribed by law.' The respondents base their objection upon section six of the schedule, which recites that 'all persons now filling any office or appointment in this state, shall continue in the exercise of the duties thereof, according to their respective commissions and appointments, unless otherwise provided by law.' The respondents contend that under the operation of this provision, the old board continues in existence until 'otherwise provided by law.' But I think that in the provision previously quoted, in the constitution itself, it is 'otherwise provided by law.' The first sentence of that section devolves the duties of the state board of equalization on certain offices already existing. The second sentence prescribes the duties of the board; no legislation is needed to give effect to this provision; it is full and complete in itself, and I am of opinion that it is self-enforcing. But if this were not so, I take it that the rule which gives effect to the acts of de facto officers, applies in this case, and that where a board of public officers undertake to discharge certain functions under color of right, with the entire acquiescence of the people of the state, and, up to this time, with the acquiescence of these objectors themselves, the court will not investigate collaterally in a proceeding of this kind, the right of such officers so to act. The constitution and laws of Missouri afford a direct proceeding to oust persons who usurp the functions of public officers. Const. Mo. art. 6, § 3; 2 Wag. St. pp. 1133, 1134. I am strengthened in this view by a provision in the general statutes of Missouri (2 Wag. St. p. 1213, § 241), which relates to the validity of sales of property for taxes. This statute declares that 'the acts of officers de facto shall be as valid as if they were de jure.' Apart from the fact that the overturning of the work done by this board, and opening up the entire re-assessment of railroad taxes in the state of Missouri, for the year 1875, the most of which have probably by this time been paid, would work the greatest injury to the public interest, it does not lie in the mouth of these respondents to stand by and permit a board, alleged to be an usurping body, to perform the functions of the board claimed to be the legal board, without instituting the proper proceedings to oust it, and then to object here for the first time to the validity of its acts. I, therefore, respectfully recommend that this objection be overruled.

"3. Whether the board of equalization which fixed the valuation in question in these cases, was a board of assessors, or merely a board of equalizers. A similar question came up and was decided by your honors in the case of Paul v. Pacific R. Co. [Case No. 10,845], at the last term of this court, with reference to the power of the board of equalization established under the laws of 1873. That decision

was rendered in view of the fact that a subsequent legislature (section 7, Act March 15, 1875), had extended the terms of the previous statute, by expressly clothing the board with the power of a body of assessors. If the question rested solely upon a comparison between the language of section 12 of the act of 1873, with section 18 of article 10 of the new constitution, your honors' ruling in that case would probably govern here. That statute empowers the board 'to adjust and .equalize the aggregate valuation of the property of each of the railroad companies, liable to taxation, etc.' By the above named section of the constitution, the duty of the board is 'to adjust and equalize the valuation among the several counties in the state.' But in the same sentence it is added, 'and it shall perform such other duties as are or may be prescribed by law.' The duties prescribed by the act of March 15, 1875 (section 7), to the state board of equalization, which existed at the time the constitution was framed, are those of a body of assessors as well as equalizers: and it is reasonable to suppose that the framers of the constitution had this fact in view when they adopted the language named. Besides, it cannot be supposed that the convention intended to devolve upon the five principal officers of the state government a mere work of mathematical calculation involving no discretion whatever—the equalizing of assessments made by the county courts—a work which could better be performed by a clerk in the auditor's office. If there is room for latitude of construction or fair doubt as to the meaning of a constitutional ordinance or statute, that construction will not be adopted which results in nonsense. I therefore respectfully recommend that this objection be overruled, and that, for the purpose of ascertaining the amount of taxes due in these proceedings, the assessments made by the state board of equalization be deemed valid assessments.

"4. Whether the rates of taxation here in question are governed by the new constitution, or whether they are valid if in excess of the limits prescribed by the new constitution, but not in excess of the limits prescribed by previously existing laws. This question I regard as one of substantial difficulty. It has created considerable diversity of opinion among public officers in the state. Some of the counties appear to be conforming their rates to the limits of the new constitution, while others are levying rates which are in excess of the constitutional limits. The provisions of the constitution referred to, will be found in section 11, art. 10. The supreme court of Missouri has recently held that the provisions of this section limiting the rates of taxation for various purposes, are self-enforcing. Ex parte St. Joseph Board of Public Schools [62 Mo. 444]. But the question in that case arose upon a levy made in 1876, and for the year

1876, and that decision is hence not decisive of this question. It is admitted that the levies in controversy under these intervening petitions were not in fact ascertained until the summer of 1876, although the date at which the assessments were made, related back to the first day of August, 1875. The new constitution went into effect between these two dates, viz., on the 30th day of November, 1875. Now, unless these levies relate back to the date to which the assessment relates. August 1, 1875, a date prior to the constitution, or unless they are to be understood as having been in fact made prior to the constitution, the constitutional rates will govern. It is contended that the doctrine of relation applies, and that as this doctrine is invoked for the purpose of reaching justice, the court will invoke it here in order to reach equality of taxation; that as the date of valuation or assessment is the 1st of Aug., 1875, the levy should be held to relate back to the assessment, and the constitutional limits do not therefore apply. In support of this principle, it is conceded that the assessment and levying of taxes against railroad property for a given year, is, so to speak, a year behind general property; that for the purpose of raising the revenue of 1875, the assessment of general property is made in 1874, and the county courts ascertain and fix the rates to be levied in the spring of 1875: whereas the assessment of railroad property for 1875, though made upon the basis of the property owned and used by the railroad company, on the first day of August of that year, is not in fact completed by the state board of equalization until the spring of 1876: so that the taxes for 1875 were in fact levied and paid upon general property according to rates fixed by the county court prior to the adoption of the new constitution, viz., in the spring of 1875. Again, it is urged that the rates levied upon railroad property were, in contemplation of law, levied by the county courts at the time when they fixed the rates for general property, viz., in the spring of 1875. In support of this provision, section 12 of the act of March 15, 1875, is relied on. This section contains the following clause: 'The county court, upon receipt from the auditor of the certificate of the action of said board, shall immediately ascertain and levy the taxes for state, county, municipal township, city, incorporated town, and school purposes on the railroad and the property thereof in such county, municipal township, city, and incorporated town, at the same rates as may be levied on other property.' It is contended for the petitioners that the words 'may be levied.' are equivalent to 'have been levied,' and that the county court in performing the act here prescribed does not perform a new act of discretion, but simply declares that the rate which it had previously fixed for general property for the year in question, shall

be by the clerk extended against railroad property. This argument loses some of its force in view of the inability of the petitioners to point out to me any statute fixing a definite time when the county court shall ascertain and fix the levies for general property. Section 166 of the revenue law (2 Wag. St. p. 1193) provides that this shall be done 'as soon as may be after the assessor's book of each county shall be corrected and adjusted according to law.' The petitioners, therefore, fail to show that the levies for general property were not themselves made subsequent to the adoption of the new constitution. The attorney-general of this state has been called upon to give opinions on this subject, and his opinions are in accordance with the grounds taken by these respondents. I subjoin printed copies of three of them for the information of the court.

"I cannot see that the argument of the petitioners founded on the doctrine of relation, has any force. The assessment and the levies are distinct acts of different tribunals, and do not have any necessary reference to each other. The law is inflexible in the requirement that the property shall be assessed at its cash value upon a particular date, and the act of ascertaining and fixing the percentage of taxation to be levied is a judicial function performed by the county court based upon the amount of taxable property, as shown by assessments previously made. While, therefore, it would seem desirable, if the court can see its way clear to do so, to adopt the view taken by the petitioners in order to produce equality of taxation, and thereby to give effect to the favorite maxim that 'equity is equality,' yet I am unable to see any clear ground upon which this can be done. I submit this question to your honors, with the recommendation that the master be instructed, in computing the amounts due, to reject such portion of the rates as are in excess of the limits prescribed by the new constitution.

2 ["City of Jefferson, May 31, 1876. Sumner Boyton, Esq.—Dear Sir:—Yours of the 29th received. The construction which I have heretofore given to section 11, of article 10, of the constitution, and to which I shall adhere, is, that in the counties of the taxable wealth of yours, the rate of taxation can not exceed fifty cents on the $100 valuation, for county purposes, and that under this head are included road, bridge, poor house, and all other local county taxes, and that this section in the constitution became operative from its adoption, without additional legislation, and that it applies to counties operating under township organization, as well as to other counties in the state. Hence, in the levy of the tax for county expenses by the county courts, and for road taxes by the townships, the levy can in no case exceed the constitutional limit of fifty cents. The levy

---

2 [From 3 Cent. Law J. 725.]

of seventy cents in your county is twenty cents in excess of that limit, and, as such, can not be enforced. I know this will cut short the revenue of your county, probably below the actual necessities of the case, but there is no remedy for it but economy in its expenses, a higher valuation of property, and the actual assessment of all the property which under the present assessment system is not reached. Yours truly, John A. Hockaday.

["Jefferson City, Mo., June 19, 1876. Hon. Thos. Holladay, State Auditor—Sir:—Yours of the 14th, asking my opinion as to the rate per cent. to be levied against the railroad property of the state, for the payment of bonded debt of the state, received. Under the constitutional ordinance of June 6, 1`65, and of the act of the general assembly passed in pursuance thereof (Gen. St. 1865, c. 14), the rate of taxation for this purpose was fixed at one-fourth of one per cent. But section 14, of article 10, of the present constitution, by express terms, repeals the ordinance of 1865, and section 8, of the schedule, provides that until the legislature shall make provision by law for the payment of the state and railroad indebtedness, as provided for in section 14 of article 10, that the rate of levy upon the property of the state, for such purposes, shall be one-fifth of one per centum. I am, therefore, of opinion that section 8, of the schedule, is now in force, and applies to the assessment and levy of railroad taxes for the present year. It is true that this assessment now being made of the railroad property of the state is for the year 1875, yet, under section 10, of the act of March 15, 1875 (Sess. Acts 1875, p. 122), it is provided that the auditor shall charge the several railroad companies the amount of taxes due the state, according to the law in force at the time such assessment and levy shall be made. Section 8, of the schedule of the constitution, being, as we have already observed, now in force, and all laws and ordinances fixing any other rate of taxation being repealed by the constitution itself, I conclude that one-fifth of one per centum is the proper rate of taxation to be fixed under the present assessment. Very resp'ly, John A. Hockaday, Attorney General.

["State of Missouri. Office of Attorney General, City of Jefferson, Aug. 13, 1876. Hon. Thos. Holladay, State Auditor,—Dear Sir:—The letter of Hon. W. H. Blodgett, in reference to the rate of taxation against railroad property for school purposes, upon which you ask my opinion, is before me. The limit upon the rate of taxation for school purposes, as well as for other purposes, is presented in article 10, § 11, of the constitution, applied immediately upon the adoption and taking effect of the instrument. This was recently held to be the case, especially as to school taxes, by the supreme court of our state at St. Joseph. The opinion has not yet been reported. The only remaining question is whether it applies to school taxes for the

present year. I am inclined to think it does. Under section 1, of an act passed March 31, 1875 (Acts 1875, p. 129), the duty of levying the school tax devolves upon the county court, who are guided in making such levy by the returns made to the clerk of that court by the local school boards. It is true the rate necessary to run the schools is ascertained by the county court, so that the levy of the tax is not complete until this average is ascertained and determined. Pending the action of the court in making this average and levy of the tax, the constitution steps in with a limit upon the rate. It is not obligatory upon the court to recognize and yield to the prohibition fixed by the constitution. In passing upon similar questions, heretofore, I have uniformly held that it was. Any other construction would fail to give uniformity in enforcing the tax system, which it was the evident intention of the constitution should be done. I have the honor to be, etc., Jno. A. Hockaday.] [2]

"5. Whether this court, by its master, has jurisdiction to revise the method adopted by the county court clerk, in ascertaining the rate of taxation for school purposes. under section 12 of the act of March 24, 1873, and section 65 of the act of March 26, 1874. The former act provides as follows: 'For the purpose of levying school taxes in the several counties on railroad property, the several county courts shall ascertain from the returns in the office of the clerk of the county court, the average rate of taxation levied for school purposes, by the several local school boards or authorities, and shall cause to be charged to the said railroad companies, school taxes at said average rate on the proportionate value of said railroad property so certified to said clerk of the county court by the state auditor, under the provisions of this act.' The latter act requires the district boards to ascertain, and report to the county court, estimates of the amount of money they will require for school purposes for the ensuing year, and then provides (section 65) as follows: 'On the receipt of the estimates of the various districts, the county clerk shall proceed to assess the amount so returned, on all taxable property, real and personal, in said districts, as shown by the last annual assessment for state and county purposes, including all statements of merchants in each district, of the amount of goods, wares and merchandise owned by them, and taxable for state and county purposes. The objection raised by the respondents, the receivers, to the method adopted by the county clerk of Johnson county, and by the clerks of other counties, whose petitions are before me and have not yet been heard, is this: The respondents allege and offer to prove, by the records of the county courts in question, that the rate for school taxes has been ascertained by taking the

amount of money required in each district by the school board thereof, and dividing this amount by the total property in that district, exclusive of railroad property, as shown by the last annual assessment for state and county purposes, and that in extending this rate upon the taxable property, the valuation of railroad property within such district is included, so that the rate is extended upon property which was not taken into consideration in ascertaining the rate which would be necessary to raise the required amount, thus producing an amount greatly in excess of the amount required by the school boards.

"This method of ascertaining the rate to be levied for such purposes is, in my judgment, clearly in violation of section 65, of the act of March 26, 1874, above quoted, which requires the county clerk to assess the amount required, 'on all taxable property, real and personal, in said district, as shown by the last annual assessment,' etc. The result of this method of fixing the rate is not to produce inequality of taxation, but to produce a revenue in excess of the amount required. The method objected to is as oppressive to the farmers and merchants as to the railroad companies, since, if all the property, including railroad property, were taken into consideration in ascertaining the rate, the rate extended upon all property would be correspondingly lower. The doubt which has arisen in my mind upon this point is: Has the court jurisdiction to revise and correct such erroneous levies? Can this court, by its master in chancery, assume to this extent the functions devolved by law, upon the county court clerks? If the rate fixed does not exceed the constitutional limit, can this court say that the errors committed in ascertaining such rate render the levy void, so that this court can do over again the work of the county clerk and reject the void excess? On the other hand it is urged that in a proceeding in equity, it would be unconscionable for the court to order the payment out of a fund in its hands, of a tax which is clearly in excess of any amount lawfully ascertained. I incline to the latter view, and my recommendation on this point made with much diffidence is, that the master be instructed to ascertain a rate, based upon the entire taxable property in the various school districts, and to extend such rate upon such property.

"6. Whether, if it appears, as a matter of fact, that the state board of equalization have made a mistake in determining the number of miles of the Pacific Railroad in any county, it is competent for the court, through its master, to hear evidence upon such question and correct such mistakes, thereby increasing or diminishing the taxable valuation of the property of the railroad company, fixed by the board for such county. Proof has been offered which clearly shows that the board of equalization has committed mistakes in this particular, as to two, and probably three,

of the counties. Such mistakes probably originated in clerical errors in the statement made by the railroad company to the state auditor, upon which the board of equalization based their estimates of valuation. It is in proof that Osage county has received credit for five miles of road more than there are in that county, and that the number of miles of road credited to Gasconade county is 2½ miles less than the number of miles actually in that county, and that there is a deficiency of 2½ miles in the assessment made by the board for some other county or counties, but what county or counties has not been ascertained. There is no controversy that these errors of fact have been committed by the board of equalization; nor will it probably make any difference in the aggregate value of taxes to be paid by the receivers, whether the mistakes are corrected or not. But the question remains: Has the court jurisdiction to correct them so as to produce equality among the counties, as to which the mistakes have occurred? As no party injuriously affected by these mistakes has complained, I would respectfully recommend that they be allowed to stand.

"7. As to penalties—Section 16, of the act of March 15, 1875, provides as follows: "In case any railroad company shall fail to pay into the county treasury of any county, wherein, by the provisions of this act, any taxes levied for state, county, municipal township, city, incorporated town or school purposes, on the property of said railroad, are made payable on or before the first day of July next, after the same shall have been levied, said company shall forfeit and pay into the county treasury, in addition to the taxes with which said company may stand charged on the books of said county, a penalty of 2½ per cent. per month on the amount of taxes against said company, which penalty shall be apportioned to the various funds respectively.' I do not think this penalty ought to be enforced in this case. First, the taxpayer here is not a 'railroad company,' but the receivers of this court; secondly, I am of opinion that the receivers are not in default. These tax bills were presented to them during the vacation of this court; grave doubts existed as to the legality of some of the levies, particularly those in excess of the rates prescribed by the new constitution, and by a friendly arrangement between the attorney for the receivers and the attorneys for these intervenors, it was determined to wait until the commencement of the term, and take the advice of the court upon the question, and these petitions are filed for that purpose. I respectfully suggest that it would be reasonable to allow 10 per cent. per annum in the way of penalties, as was done by this court at the last term, in the case of Paul v. Pacific Railroad [Case No. 10,845], and other cases then determined involving the validity of the railroad taxes for 1873.

"8. As to attorney's fees—In addition to the taxes claimed, the petitioners claim a sum equivalent to 5 per cent. of the sum recovered, as attorney's fees, under section 4, of the act of March 29, 1875. This act provides specifically the manner in which suit may be brought and prosecuted, 'whenever any railroad company shall fail or shall have heretofore failed, within the time prescribed by law, to pay any taxes assessed and levied against it, etc.' I think this demand ought not to be allowed. No 'railroad company' here has failed to pay taxes, but the parties who have failed are the officers of this court, and their excuse for so failing is above stated, and I am of opinion that this is not a suit for the recovery of taxes, such as is contemplated by the act named. I therefore respectfully recommend that this claim be not allowed."

Exceptions being filed to the master's report, the following judgment was delivered by

TREAT, District Judge: 1. The tax bills are to be presumed correct, unless on their face it appears that there was an illegal assessment. The court must decide on the face of the bills whether any demand exists thereunder. If facts dehors the face of the bills are necessary to show their illegality, the person controverting their legality must show those facts. In this case it is the duty of the receivers, under the instruction of the court, to pay the taxes due. They are to pay such taxes and no other, i. e., to pay no more than what the law exacts; and they must inquire, as private citizens or corporations have a right to do, into what the law requires, and by the same legal methods. When the tax is assessed and no appeal taken, the taxpayer is bound as to valuation, yet may resist any excess of rates. Under the rulings of this court, he must pay, or tender the amount to be due, and contest for the balance. The ruling of the master, as to the first point submitted concerning burden of proof is correct. And the exception thereto is overruled.

2. As to the second proposition submitted, it is ruled that the board of equalization under the new constitution, became at once the only board thereafter for that purpose, and was clothed with all the powers and duties of the board for which it was substituted, and that its acts are valid and obligatory. The exceptions on this point are overruled.

3. The foregoing views as to the second point, cover the third point. The exceptions to the third point in the master's report, are, therefore, overruled.

4. As to the fourth point, it is ruled that the rates prescribed by the new constitution must control. That organic law at the date of its operation became the paramount law on this subject, and even if it worked inequality as to pending matters of taxation, no court can go behind its requirements, and import into it exceptions, on the ground that

inequality would otherwise result. All organic changes may, and must, work results different from what previously existed; but that fact does not deprive the sovereign will of its power, or enable a court to say that what is thus made the supreme law, shall not be so, because it may be that in the final outcome of the transition from the old to the new order of things, one or more inequalities may be wrought. Such organic changes must necessarily be general, and operate on all matters for which they provide. Were this not so, it would have to be held that all pending matters of whatsoever nature, must continue to be regulated and controlled by an abrogated system, or that two constitutional systems were in force at the same time, concerning the same subject-matter. Matters of taxation are subject to the sovereign power of the state, and when the sovereign will is expressed, it controls not only state officers, but also all the municipal subdivisions of the state. The master is instructed, therefore, to reject all excess of rates over those prescribed by the new constitution—and the exceptions to this part of his report are overruled.

5. As to the fifth point: It is suggested that the amount of school tax is excessive for the reasons stated, and, therefore, the master should reduce the same to the amount which is justly taxable. He must rely upon the assessment. If it exceeds the legal or constitutional limit, he must cut it down. If it does not, he can not assume the functions of the assessor, and reduce the assessable value, nor include omitted property which was taxable. His functions are not to value or assess, but simply to decide whether the rate is in excess; and at that point his functions cease. Whether more or less property has been included in the assessment is not for the master to decide. If, on an estimate of all the taxable property, including the railroad property, a larger or smaller sum would be required, is not for him to determine. It may be that through the means adopted, an excess of taxes will be received for a specified year; but if so, the amount required may be diminished the subsequent year, and thus equalization effected. But this court can not, nor can the master, undertake, through valuations of property included or omitted, to determine that a smaller or greater rate of school tax would be required. The action of the competent authorities must be considered decisive of that question. As to this point, the court overrules the views of the master, and sustains the exception thereto. In passing upon that class of taxes he will conform to the views herein expressed.

6. The same doctrine must prevail on this point, as last stated, viz., that the assessment and valuation, as to the number of miles in a specified county, must control. The master can not perform the functions of an assessor or a board of appeals for equalizing and adjusting the amount of taxable property in a county. True, if there were no property of the tax payer in the county, he could refuse to pay a tax bill made out against him; but if he has the property specified, and the assessors, through mistake as to its measurement, tax him more than would have occurred if the correct amount had been ascertained, the master can not go behind the valuation. Were this otherwise, this court would become a board of appeals to correct errors in assessments, and the revenues of the state and its municipal subdivisions would, or might be, destroyed so far as the immediate and pressing needs of the government require prompt action. This court can not correct mistakes of fact, if any are made by the board of equalization, and substitute its own judgment by hearing evidence, for that of the proper tribunal established for that purpose. The exceptions to the sixth point are overruled.

7. The views of the master as to penalties are in precise accord, under the facts stated, with the previous rulings of this court. The exceptions under this head are overruled.

8. As to this point, in addition to the views of the master, it may be stated that the court, in order to expedite the collection of taxes, ordered the receivers to pay whatever taxes were due. The receivers were officers of the court, and the funds in their hands were subject to its order. To avoid delay, costs and expenses, the counties, instead of bringing suits against the delinquent roads, were permitted to apply summarily to this court. It seems that the delays and excessive demands, illegal in their scope in some particulars, caused the investigation which has ensued. There was an honest doubt as to the law, and its effects upon the demand made. Instead of driving the parties to a protracted litigation for the settlement of their disputes, this court has, as a court of equity, permitted all concerned to appear and contest, subject to equitable rules. The intervenors, as is now held, made excessive demands which the receivers ought not to have paid. Hence no penalties can be enforced. Exceptions to the eighth point overruled.

Ordered accordingly.

[NOTE. This case is published in 4 Dill. 41, as a note to Paul v. Pacific R. Co., Case No. 10,845. Upon the question of the foreclosure of the mortgages of the Pacific Railroad Company, see 3 Fed. 772; 12 Fed. 641; 95 U. S. 1; 101 U. S. 289; 111 U. S. 505, 4 Sup. Ct. 583. For the litigation involving the right of the county of St. Louis to have the earnings of the railroad applied to payment of interest on certain bonds of the county, see Cases Nos. 7,739, 7,740, and notes.]